[No. A126234. First Dist., Div. Two. Oct. 21, 2010.]

JOHN CHIATELLO, Plaintiff and Appellant, v.
CITY AND COUNTY OF SAN FRANCISCO, Defendant and Respondent.

Counsel

Silverstein & Pomerantz, Amy L. Silverstein, Edwin P. Antolin, Johanna W. Roberts and Charles E. Olson for Plaintiff and Appellant.

Dennis J. Herrera, City Attorney, Julie Van Nostern, Chief Tax Attorney, James M. Emery, Chief of Complex Litigation, and Andrew N. Shen, Deputy City Attorney, for Defendant and Respondent.

Opinion

**RICHMAN, J.**—This court has repeatedly recognized that "money is the lifeblood of modern government. Money comes primarily from taxes, and, as the importance of a predictable income stream from taxes has grown, governments at all levels have established procedures to minimize disruptions" that would interfere with essential public operations. (*Batt v. City and County of San Francisco* (2007) 155 Cal.App.4th 65, 71 [65 Cal.Rptr.3d 716] (*Batt*); see *Flying Dutchman Park, Inc. v. City and County of San Francisco* (2001) 93 Cal.App.4th 1129, 1135–1136 [113 Cal.Rptr.2d 690] (*Flying Dutchman*); *Helms Bakeries v. St. Bd. Equalization* (1942) 53 Cal.App.2d 417, 421 [128 P.2d 167].) This principle is of sufficient magnitude to warrant a constitutional prohibition on any "legal or equitable process . . . to prevent or enjoin the collection of any tax" (Cal. Const., art. XIII, § 32 (article XIII, section 32)), reinforced by numerous statutes to the same effect. In *Daar v. Alvord* (1980) 101 Cal.App.3d 480 [161 Cal.Rptr. 658], the Court of Appeal held that an action aimed at challenging and halting the collection of a local property tax could not evade these prohibitions by being framed as one intended to prevent governmental waste under Code of Civil Procedure section 526a (section 526a).

In 2008, the voters of San Francisco amended the existing municipal payroll tax in a manner one taxpayer—who, not incidentally, was not subject to the tax—believed unlawful for a number of reasons. He filed a complaint for declaratory relief that the amending measure was invalid, and sought an injunction "preventing the expenditure of taxpayer monies in implementing, applying or enforcing" the measure. Following *Daar*, the trial court concluded that the taxpayer lacked standing to challenge the measure, and dismissed the complaint.

Although we do not agree that *Daar* is controlling, we do agree with the trial court's ultimate conclusion. The crucial point distinguishing *Daar* is the

existence of a state statute expressly prohibiting interference with the collection of a real property tax in language virtually identical to article XIII, section 32. There is no state statute immunizing a municipal payroll tax from challenge, so *Daar* is not dispositive. On the other hand, we conclude that a number of authorities purportedly holding that a taxpayer action under section 526a may be used to challenge the validity of a taxing statute do not actually decide that point.

After a full and fresh reexamination of the issue, we believe there are weighty policy reasons why no California taxpayer plaintiff has ever been permitted to halt implementation of a local tax. The hostility to the interruption of local tax revenues—of which article XIII, section 32 is but one example—traces back to the 19th century. There are legitimate concerns for limiting the ability of persons not required to pay a tax themselves to challenge the validity of that tax, particularly when they would enjoy a more advantageous position than given to persons actually required to pay it. And the most obvious negative consequence of allowing legal challenges by persons lacking a direct financial interest in the operation of a tax is the unacceptable risk of paralyzing the financial stability of local governments with a flood of lawsuits. In light of our analysis, we agree with the trial court's ultimate conclusion that plaintiff lacked standing. We thus affirm the judgment of dismissal.

## BACKGROUND

In 1970, the City and County of San Francisco (City) enacted a Payroll Expense Tax Ordinance (Payroll Tax). (S.F. Bus. & Tax Regs. Code, § 901 et seq.) It imposed a tax of one and one-half percent "upon every person engaging in business within the City." (*Id.*, § 903; see *id.*, § 903.1.) The scope of the tax on "payroll expense" applied to "compensation paid to, on behalf of, or for the benefit of an individual, including salaries, wages, bonuses, commissions, property issued or transferred in exchange for the performance of services . . . and any other form of compensation, who, during any tax year, performs or renders services, in whole or in part in the City." (*Id.*, former § 902.1, subd. (a).)

In 2004, the City's voters declined to enact a measure which would have extended the Payroll Tax to "pass-through" entities, which were defined as including "a trust, partnership, corporation described in Subchapter S of the Internal Revenue Code of 1986, . . . limited liability company, limited

liability partnership, professional corporation, and on [any] other person or entity . . . which is not subject to the income tax imposed by Subtitle A, Chapter 1 of the Internal Revenue Code of 1986, . . . or which is allowed a deduction in computing such tax for distributions to the owners or beneficiaries of such person or entity." (S.F. Bus. & Tax Regs. Code, § 902.2; see *id.*, § 902.1.)

In 2008 the City's Board of Supervisors proposed another ballot proposition—designated Proposition Q—that was intended to clarify the reach of the Payroll Tax. Although the primary purpose of the measure appears to have been to raise the small business exemption to the Payroll Tax, another goal was to settle the question of the scope of the "pass-through" coverage. Concerning two provisions of the Payroll Tax that would be amended (i.e., S.F. Bus. & Tax Regs. Code, §§ 902.1, 902.2), the import of Proposition Q was explained to voters by the City Controller as follows: "Some types of corporations compensate their partners by paying them a share of the firm's annual profits in addition to any salary paid for services rendered. Currently, the City's payroll tax is not paid on these profits. The proposed ordinance would require the payroll tax to be paid on all partner compensation, excluding returns on investment, and would result in additional gross annual tax revenue of $17 million. The businesses that would be affected are typically law, accounting, medical, and other types of professional corporations." Proposition Q was adopted by the voters on November 4, 2008.

On December 30, 2008, plaintiff John Chiatello filed a verified complaint challenging the Proposition Q change to the Payroll Tax as applied to "pass-through" entities. Identifying himself as "a resident of the City who owns real property located within the City and pays property taxes," plaintiff stated the aim of his complaint as follows: "Enforcement by the City of the invalid and illegal provisions of Proposition Q will result in wasteful expenditures of taxpayer monies. Code of Civil Procedure Section 526a provides a cause of action to taxpayers such as plaintiff to prevent wasteful expenditures of taxes in this manner. Thus, by this action, plaintiff seeks a declaration that the City may not enforce Proposition Q to tax distributions of profits to owners of pass-through entities."

In his single cause of action—styled as "Taxpayer Action to Prevent Waste—CCP § 526a Declaratory Relief—CCP § 1060"—plaintiff alleged that "Proposition Q's Amendments were not effective" because "the City misled the electorate in its description of Proposition Q" in that Proposition Q "did not amend a key provision governing the tax base for Associations," to wit: "[San Francisco Business and Tax Regulations Code] Section 903.1 continues

to provide explicitly that 'distribution of ownership profit or loss' is not included within a Partnership's payroll expense tax base."

Plaintiff had additional reasons for assailing the pass-through taxation provisions of Proposition Q. As he alleged at length, "distributions of profits by a Partnership are not compensation for services." "Taxation of Profit Distributions" was also invalid because it was prohibited by Revenue and Taxation Code section 17041.5, which forbids local government from imposing an income tax. Finally, plaintiff alleged that Proposition Q was invalid because it "violates the Single Subject Rule . . . in the City's Charter."

Plaintiff alleged that declaratory relief "declaring the invalidity of Proposition Q is necessary to prevent the actual and threatened expenditure of taxpayer monies in implementing and applying these invalid and unlawful provisions, including but not limited to the development of new forms and procedures for submitting and processing such returns, the creation of website materials addressing the changes to the Payroll Expense Tax, the training of staff to handle returns and issues under these new provisions, and the costs of enforcement as taxpayers attempt to comply with the law. The expenditure of these funds is a waste of taxpayer monies and requires immediate adjudication of the legality of Proposition Q." Plaintiff prayed for a declaratory judgment "pursuant to Code of Civil Procedure Section 526a" determining that "any expenditure of taxpayer monies to implement, apply or enforce . . . Proposition Q to be a waste of taxpayer monies," prohibited by state law, and enacted in violation of the City's single subject rule; in addition, plaintiff also prayed for issuance "of a judgment pursuant to Code of Civil Procedure Section 526a restraining and preventing the expenditure of taxpayer monies in implementing, applying or enforcing . . . Proposition Q."

The City interposed a general demurrer to the complaint. In addition to arguing that Proposition Q was validly drafted and adopted, the City maintained that "plaintiff lacks standing to challenge San Francisco's Payroll Expense Tax." Citing *Daar v. Alvord, supra,* 101 Cal.App.3d 480, the City explained that "in tax disputes, the rule is 'Pay First, Litigate Later,' precluding injunctive or declaratory relief," and "plaintiff may not invoke section 526a to subvert the 'pay first' rule."

In his opposition to the demurrer, plaintiff cited a number of decisions as authority that he did have standing to press his claim based on section 526a.

Plaintiff argued that the "pay first" principle did not apply to him because he "is not subject to the Payroll Expense Tax," and thus had no obligation to pay anything, so it would be a logical absurdity to require him to comply with refund procedures before being allowed to challenge Proposition Q. Plaintiff further argued that Proposition Q "is void for lack of voter approval" as required by state Proposition 218 (Cal. Const., art. XIII C, § 2, subd. (b)). Plaintiff acknowledged in a footnote that "The City may point out that [plaintiff's] complaint does not include an explicit cause of action under Proposition 218. However, the underlying facts are all encompassed within the complaint, and the demurrer cannot be sustained on that basis. Rather, [plaintiff] must be allowed to amend the complaint to provide greater clarity regarding this valid claim."[1]

The trial court conducted two hearings. The first was largely devoted to the issue of whether plaintiff had standing to prosecute the action. However, the court continued the matter for a week so that it could "take a harder look at the [Proposition] 218 aspect." After hearing additional argument on that issue, the trial court issued this order: "Plaintiff lacks standing to sue. This Court may not grant injunctive relief to prevent tax collection. (See *Daar v. Alvord*[, *supra*,] 101 Cal.App.3d 480.) Plaintiff fails to allege he is injured or will be injured by Proposition Q. Any party who may be injured by Proposition Q has an adequate remedy to challenge its validity by paying the tax first and then bringing a claim for refund before seeking judicial relief. [¶] Leave to amend is denied. The text of the amendments to [San Francisco Business and Taxation Regulations Code] section 902.1(d) was included in the voter pamphlet, and the effect of Proposition Q was adequately explained to voters. There is no reasonable likelihood that plaintiff will be able to state a valid cause of action."

Plaintiff perfected this timely appeal from the judgment of dismissal entered in due course.

---

[1] The theory of plaintiff's proposed cause of action would appear to be that Proposition 218 directs that "No local government may impose, extend, or increase any general tax unless and until that tax is submitted to the electorate and approved by a majority vote." (Cal. Const., art. XIII C, § 2, subd. (b).) A "general tax" is one "imposed for general governmental purposes" (*id.*, § 1, subd. (a)), which courts have interpreted to mean a tax whose revenues are placed in the taxing jurisdiction's general fund, thus making them available for any and all governmental purposes. (*Weisblat v. City of San Diego* (2009) 176 Cal.App.4th 1022, 1039 [98 Cal.Rptr.3d 366]; *Howard Jarvis Taxpayers Assn. v. City of Roseville* (2003) 106 Cal.App.4th 1178, 1185 [132 Cal.Rptr.2d 1].) The Payroll Tax is clearly a general tax because it has always specified that its proceeds "shall be deposited in the City's general fund and may be expended for any purposes of the City." (S.F. Bus. & Tax Regs. Code, § 903, subd. (b).)

## DISCUSSION

### The Standard of Our Review

"Because this case comes to us on a demurrer for failure to state a cause of action, we accept as true the well-pleaded allegations in plaintiffs' first amended complaint. ' "We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. [Citation.] We also consider matters which may be judicially noticed." [Citation.] Further, we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context. [Citation.]' " (*Evans v. City of Berkeley* (2006) 38 Cal.4th 1, 6 [40 Cal.Rptr.3d 205, 129 P.3d 394].) We likewise accept facts that are reasonably implied or may be inferred from the complaint's express allegations. (*Curcini v. County of Alameda* (2008) 164 Cal.App.4th 629, 633, fn. 3 [79 Cal.Rptr.3d 383]; *Traders Sports, Inc. v. City of San Leandro* (2001) 93 Cal.App.4th 37, 43 [112 Cal.Rptr.2d 677].) " ' "A demurrer tests the legal sufficiency of the complaint . . . ." [Citations.] On appeal from a dismissal after an order sustaining a demurrer, we review the order de novo, exercising our independent judgment about whether the complaint states a cause of action as a matter of law. [Citations.] When the trial court sustains a demurrer without leave to amend, we must also consider whether the complaint might state a cause of action if a defect could reasonably be cured by amendment. If the defect can be cured, then the judgment of dismissal must be reversed to allow the plaintiff an opportunity to do so. The plaintiff bears the burden of demonstrating a reasonable possibility to cure any defect by amendment. [Citations.]' " (*Batt, supra,* 155 Cal.App.4th 65, 71, quoting *Flying Dutchman, supra,* 93 Cal.App.4th 1129, 1134–1135.)

### Standing and Section 526a

■ "Standing is a jurisdictional issue that . . . must be established in some appropriate manner." (*Waste Management of Alameda County, Inc. v. County of Alameda* (2000) 79 Cal.App.4th 1223, 1232 [94 Cal.Rptr.2d 740].) "As a general principle, standing to invoke the judicial process requires an actual justiciable controversy as to which the complainant has a real interest in the ultimate adjudication because he or she has either suffered or is about to suffer an injury of sufficient magnitude reasonably to assure that all of the relevant facts and issues will be adequately presented to the adjudicator. [Citations.] To have standing, a party must be beneficially interested in the controversy; that is, he or she must have 'some special interest to be served or some particular right to be preserved or protected over and above the interest held in common with the public at large.' [Citation.] The party must be able to demonstrate that he or she has some such beneficial interest that is

concrete and actual, and not conjectural or hypothetical. A complaining party's demonstration that the subject of a particular challenge has the effect of infringing some constitutional or statutory right may qualify as a legitimate claim of beneficial interest sufficient to confer standing on that party. [Citation.]" (*Holmes v. California Nat. Guard* (2001) 90 Cal.App.4th 297, 314–315 [109 Cal.Rptr.2d 154].)

■ " 'The fundamental aspect of standing is that it focuses on the party seeking to get his complaint before a . . . court, and not [on] the issues he wishes to have adjudicated.' " (*Harman v. City and County of San Francisco* (1972) 7 Cal.3d 150, 159 [101 Cal.Rptr. 880, 496 P.2d 1248], quoting *Flast v. Cohen* (1968) 392 U.S. 83, 99 [20 L.Ed.2d 947, 88 S.Ct. 1942].) "The issue of standing is determined by the courts as a matter of policy. In large measure it depends on the fitness of the person to raise the issues." (*Farley v. Cory* (1978) 78 Cal.App.3d 583, 588 [144 Cal.Rptr. 923].) "The question of standing to sue may be raised by demurrer." (*Torres v. City of Yorba Linda* (1993) 13 Cal.App.4th 1035, 1041 [17 Cal.Rptr.2d 400], citing *Parker v. Bowron* (1953) 40 Cal.2d 344, 351 [254 P.2d 6].)

However strict the concept of standing may be in other contexts, it has been considerably relaxed by section 526a, which provides in pertinent part: "An action to obtain a judgment, restraining and preventing any illegal expenditure of, waste of, or injury to, the estate, funds, or other property of a county, town, city or city and county of the state, may be maintained against any officer thereof, or any agent, or other person, acting in its behalf, either by a citizen resident therein, or by a corporation, who is assessed for and is liable to pay, or, within one year before the commencement of the action, has paid, a tax therein. This section does not affect any right of action in favor of a county, city, town, or city and county, or any public officer; provided, that no injunction shall be granted restraining the offering for sale, sale, or issuance of any municipal bonds for public improvements or public utilities."

■ This relaxation is a consequence of the salutary goal of section 526a: "The primary purpose of this statute, originally enacted in 1909, is to 'enable a large body of the citizenry to challenge governmental action which would otherwise go unchallenged in the courts because of the standing requirement.' [Citation.] [¶] California courts have consistently construed section 526a liberally to achieve this remedial purpose." (*Blair v. Pitchess* (1971) 5 Cal.3d 258, 267–268 [96 Cal.Rptr. 42, 486 P.2d 1242]; accord, *Santa Barbara County Coalition Against Automobile Subsidies v. Santa Barbara County Assn. of Governments* (2008) 167 Cal.App.4th 1229, 1236 [84 Cal.Rptr.3d 714]; *Cates v. California Gambling Control Com.* (2007) 154 Cal.App.4th 1302, 1308 [65 Cal.Rptr.3d 513].) Thus, "under section 526a 'no showing of special

damage to the particular taxpayer [is] necessary' " for the taxpayer to prevent injury to the public. (*White v. Davis* (1975) 13 Cal.3d 757, 764 [120 Cal.Rptr. 94, 533 P.2d 222], quoting *Crowe v. Boyle* (1920) 184 Cal. 117, 152 [193 P. 111].)

In point of fact, this liberality has twice outrun the literal statutory language. Notwithstanding the plain language of section 526a identifying the plaintiff as "a citizen resident," it can be invoked by nonresident taxpayers. (*Irwin v. City of Manhattan Beach* (1966) 65 Cal.2d 13, 18–20 [51 Cal.Rptr. 881, 415 P.2d 769].) And courts have applied section 526a to agencies of the state, even though only local governmental units and officers are named in the statute's text. (*Serrano v. Priest* (1971) 5 Cal.3d 584, 618, fn. 38 [96 Cal.Rptr. 601, 487 P.2d 1241]; *Blair v. Pitchess, supra,* 5 Cal.3d 258, 268; see *Cates v. California Gambling Control Com., supra,* 154 Cal.App.4th 1304, 1308–1309 [failure of state officials to collect money due under gaming compacts]; *Vasquez v. State of California* (2003) 105 Cal.App.4th 849, 854 [129 Cal.Rptr.2d 701] ["It is established that an action lies under section 526a . . . to enforce the government's duty to collect funds due the State."]; see also *Cornelius v. Los Angeles County etc. Authority* (1996) 49 Cal.App.4th 1761, 1775–1776 [57 Cal.Rptr.2d 618] and decisions cited.)

■ Just what amounts to "waste" is more readily intuited than enunciated. It has been described as "a useless expenditure . . . of public funds" that is incapable of achieving the ostensible goal. (*Harnett v. County of Sacramento* (1925) 195 Cal. 676, 682–683 [235 P. 445] [funds for special election that could not result in stated purpose of election].) Certainly it reaches outright fraud, corruption, or collusion. (E.g., *Harman v. City and County of San Francisco, supra,* 7 Cal.3d 150, 160; *Nickerson v. San Bernardino* (1918) 179 Cal. 518, 522–523 [177 P. 465].) Even when " 'done in the exercise of a lawful power,' " public spending may qualify as waste if it is " 'completely unnecessary,' " or " 'useless,' " or "provides no public benefit." (*Sundance v. Municipal Court* (1986) 42 Cal.3d 1101, 1138–1139 [232 Cal.Rptr. 814, 729 P.2d 80]; see *County of Ventura v. State Bar* (1995) 35 Cal.App.4th 1055, 1059 [41 Cal.Rptr.2d 794].) Waste is money that is squandered, or money that is left uncollected, and thus is a constitutionally prohibited gift of public resources. (See *Harman v. City and County of San Francisco, supra,* 7 Cal.3d at pp. 165–169 [public property sold for less than statutory minimum]; cf. *Lundberg v. County of Alameda* (1956) 46 Cal.2d 644, 647 [298 P.2d 1] [validity of tax exemption unsuccessfully challenged].) Waste can exist even when there is no net loss, as when "illegal procedures actually permit a saving of tax funds." (*Wirin v. Parker* (1957) 48 Cal.2d 890, 894 [313 P.2d 844].)

Waste does not encompass the great majority of governmental outlays of money or the time of salaried governmental employees, nor does it apply to

the vast majority of discretionary decisions made by state and local units of government: " '[T]he term "waste" as used in section 526a means something more than an alleged mistake by public officials in matters involving the exercise of judgment or wide discretion. To hold otherwise would invite constant harassment of city and county officers by disgruntled citizens and could seriously hamper our representative form of government at the local level. Thus, the courts should not take judicial cognizance of disputes which are primarily political in nature, nor should they attempt to enjoin every expenditure which does not meet with a taxpayer's approval.' " (*Sundance v. Municipal Court, supra,* 42 Cal.3d 1101, 1138–1139, quoting *City of Ceres v. City of Modesto* (1969) 274 Cal.App.2d 545, 555 [79 Cal.Rptr. 168].) But whatever else it may or may not be, it is unquestionably waste for government to budget or spend money administering an illegal ordinance. (See *Tobe v. City of Santa Ana* (1995) 9 Cal.4th 1069, 1086 [40 Cal.Rptr.2d 402, 892 P.2d 1145], citing *White v. Davis, supra,* 13 Cal.3d 757, 764; *Blair v. Pitchess, supra,* 5 Cal.3d 258, 285–286, fn. 21.)

### *Daar v. Alvord* Is Not Controlling

*Daar v. Alvord* cannot be understood without appreciating the role played by article XIII, section 32, which provides: "No legal or equitable process shall issue in any proceeding in any court against this State or any officer thereof to prevent or enjoin the collection of any tax. After payment of a tax claimed to be illegal, an action may be maintained to recover the tax paid, with interest, in such manner as may be provided by the Legislature."

It is easy to discern why *Daar v. Alvord* became the prime focus of the parties' dispute. The case involved one of the first decisions in the wake of the passage of Proposition 13 to consider the sea change that measure wrought in the assessment and collection of ad valorem real property taxes. Plaintiff Daar and his company owned real property and paid the taxes assessed on it by Los Angeles County. He then sued county officials for a refund of those taxes, for himself and "all persons and entities similarly situated." (*Daar v. Alvord, supra,* 101 Cal.App.3d at p. 482.) That part of the suit was not at issue. What was in play was the cause of action for injunctive relief under section 526a "to prevent the defendants from expending those funds constituting the assertedly excessive taxes collected by defendants and, further, to require defendants to impound those funds pending resolution of the matter," namely, Daar's claim that officials were refusing to apply Proposition 13's 1 percent cap to the unsecured portion of the assessment roll. Daar appealed from the trial court's denial of a preliminary injunction. (*Daar v. Alvord, supra,* 101 Cal.App.3d 480, 482–483.)

Daar's reliance upon section 526a was countered by the defendants invoking "the long established principle, recognized both in the California

Constitution and in the Revenue and Taxation Code, which precludes taxpayers from enjoining the collection of taxes." (*Daar v. Alvord, supra,* 101 Cal.App.3d at p. 484.) The constitutional provision is article XIII, section 32. The Revenue and Taxation Code provision is section 4807, which provides: "No injunction or writ of mandate or other legal or equitable process shall issue in any suit, action, or proceeding in any court against any county, municipality, or district, or any officer thereof, to prevent or enjoin the collection of property taxes sought to be collected." The Court of Appeal further noted that by enacting Revenue and Taxation Code section 5140, "the Legislature has provided a remedy for the taxpayer who claims to have paid taxes illegally imposed or erroneously collected,"[2] and "The decisional law has uniformly relied on the 'adequacy of legal remedy' provided by Revenue and Taxation Code section 5140 . . . to reject efforts by individual or corporate taxpayers to challenge some aspect of the tax collection process, declaring that the basic rationale for precluding such challenge is the public policy favoring the uninterrupted funding of governmental activities." (*Daar v. Alvord, supra,* 101 Cal.App.3d 480, 485.)

The issue of collection was the point the *Daar* plaintiffs attempted to use to keep their suit alive. The Court of Appeal rejected the attempt: "Plaintiffs do not herein challenge the *collection* of assertedly illegally imposed taxes by defendants, but rather seek to prevent the collected taxes from *being spent* by defendants and to require their impounding pending a determination of the lawfulness of imposition of the taxes at the pre-Proposition 13 rate. Defendants contend, however, that, if it is legally permissible to enjoin a governmental entity from spending what it has collected, the constitutional and statutory provisions concerning collection will be rendered totally ineffective, a result unintended by either the framers of the Constitution or the Legislature.[3]

"In resolving the issue presented herein, we consider whether there is any conflict between Code of Civil Procedure section 526a and section 32 of article XIII of the California Constitution and Revenue and Taxation Code section 4807. We have no difficulty in harmonizing these constitutional and

---

[2] That statute provides, with respect to real property taxes, "The person who paid the tax . . . may bring an action only in the superior court . . . against a county or a city to recover a tax which the board of supervisors of the county or the city council of the city has refused to refund . . . ." (Rev. & Tax. Code, § 5140.)

[3] Parenthetically, we note that although the word "collection" is not used in the complaint, plaintiff's prayer for injunctive and declaratory relief against "the costs of enforcement" as well as public monies expended in "implementing, applying or enforcing" Proposition Q would include the actual collection of tax revenues generated by Proposition Q. Plaintiff does not contend otherwise.

statutory provisions. We deem that the illegal governmental activity which is subject to taxpayer challenge in Code of Civil Procedure section 526a does *not* include activity characterized as illegal solely by reason of purportedly illegal tax *collection*. It can be argued—but not reasonably so we think—that any expenditure of illegally collected taxes is per se an illegal governmental activity. We reject any such broad characterization as contrary to accepted principles of reasonable construction of constitutional and statutory provisions." (*Daar v. Alvord, supra,* 101 Cal.App.3d 480, 485–486.)

The *Daar* court used the word "standing" only once, and that obliquely, in a quote from the Supreme Court. (See *Daar v. Alvord, supra,* 101 Cal.App.3d 480, 484, quoting the excerpt from *Blair v. Pitchess, supra,* 5 Cal.3d 258, 267–268 set out *ante.*) Nevertheless, the clear import of its reasoning was that Mr. Daar and his company, as taxpayers liable for real property taxes, lacked standing to seek a prepayment adjudication of the legality of that tax. That is how it was construed in *McKendry v. County of Kern* (1986) 180 Cal.App.3d 1165, 1168 [226 Cal.Rptr. 45], the sole reported decision citing *Daar.*

The obvious relevance of *Daar* here is the conclusion that section 526a cannot be used to challenge collection of taxes a plaintiff may believe is illegal. But *Daar* was not the simple collision of that statute and article XIII, section 32. Equally prominent was Revenue and Taxation Code section 4807, which parallels the language of the constitutional provision. Because we believed this point was not adequately addressed in the briefs already on file, we solicited supplemental briefing from the parties. Armed with this additional input, we conclude that *Daar* is not controlling here.

It must be remembered that *Daar* involved real property taxes. These were clearly deemed of sufficient importance to the functioning of local government that the Legislature enacted Revenue and Taxation Code section 4807 replicating the constitutional rule of article XIII, section 32 prohibiting efforts to enjoin the collection of such taxes by cities and counties. And it is that statute that is key to a proper understanding of *Daar v. Alvord.* As far as we can determine, that statute is unique in extending immunity to local taxing authorities. Every other statute extends immunity only to suits against the state or any administering state officer. (See Fish & G. Code, § 8064 [commercial fishing landing tax]; Rev. & Tax. Code, §§ 6931 [sales and use taxes], 8146 [motor vehicle fuel tax], 9171 [use fuel tax], 11571 [private railroad car tax], 12101 [insurance tax], 13682 [gift tax], 19381 [franchise and income taxes], 30401 [cigarette tax], 32411 [alcoholic beverage tax],

38611 [timber yield tax], 40125 [energy resource surcharge], 41108 [emergency telephone users surcharge], 43471 [hazardous substances tax], 45701 [integrated waste management fee], 46251 [oil spill response, prevention, and administration fees], 50143 [underground storage tank maintenance fees], 60541 [diesel fuel tax]; Unemp. Ins. Code, § 1851 [unemployment insurance contributions].) Without regard to whether article XIII, section 32 could protect the county officials in *Daar*, Revenue and Taxation Code section 4807 could—and did.[4]

The supplemental briefing, and our own research, have found no state statute extending a comparable immunity to city or county officials administering a tax other than on real property.[5] Put bluntly, there is no state statute standing in the way of the City's having to answer a claim under section 526a that it is committing waste by administering an illegal taxing statute. In light of the foregoing, *Daar v. Alvord* should not be read as categorically prohibiting the use of section 526a to challenge a local tax.

---

[4] It is true that the *Daar* court concluded its opinion by stating that "even assuming the illegality of the collection process, Code of Civil Procedure section 526a was not intended to be utilized in challenging that illegality." (*Daar v. Alvord, supra,* 101 Cal.App.3d 480, 487.) However, this statement must be understood in the context of the court holding that Daar and his company could not maintain their suit in the face of Revenue and Taxation Code section 4807. Moreover, that same court had already decided that the challenged practice was not illegal (see *Daar v. Alvord, supra,* at p. 483, fn. 2), a conclusion subsequently upheld by the Supreme Court. (*Roy E. Hanson, Jr. Mfg. v. County of Los Angeles* (1980) 27 Cal.3d 870 [167 Cal.Rptr. 828, 616 P.2d 810].)

[5] We are not persuaded by the City's argument in its supplemental brief that section 6.15-4, subdivision (a) of its Business and Tax Regulations Code "serves a similar function with respect to San Francisco's local taxes (including its payroll expense tax) that section 4807 of California's Revenue and Taxation Code plays with respect to property taxes." The ordinance cited provides: "Persons claiming they are aggrieved under the Business and Tax Regulations Code must first pay the amount of the disputed tax, penalty and interest, and present a claim for refund to the Controller, prior to seeking judicial relief." (S.F. Bus. & Tax Regs. Code, § 6.15-4, subd. (a).) Other provisions specify that the administrative refund claim procedure "is a prerequisite to suit," which must be commenced within six months after the administrative claim is denied. (*Id.,* subds. (b) & (c).) In fact, the two statutes are totally dissimilar. As already shown, the state statute is in the nature of a categorical prohibition on judicial interference with collection of real property tax revenues.

But there is one other matter that is a near-categorical: the state has plenary authority to tax the sale of alcoholic beverages. (Cal. Const., art. XX, § 22; Rev. & Tax. Code, §§ 7282.3, 32010; *Batt v. City and County of San Francisco* (2010) 184 Cal.App.4th 163, 173 [109 Cal.Rptr.3d 129].) This exclusive authority was apparently deemed so patently obvious that when the City of Los Angeles tried to impose a tax on alcoholic beverages sold by a retailer for consumption on the premises where the sale occurred, and a Los Angeles hotel brought an action under section 526a to enjoin enforcement, the Court of Appeal stopped implementation of the law. (*Century Plaza Hotel Co. v. City of Los Angeles* (1970) 7 Cal.App.3d 616 [87 Cal.Rptr. 166].) In effect, these unambiguous constitutional and statutory commands served the same function, and achieved the same result, as did Revenue and Taxation Code section 4807 in *Daar.*

### Plaintiff Is Unable to Identify a Single Judicial Decision Approving Use of Section 526a by a Person Not Personally Liable for a Tax to Halt Collection of That Tax

But if *Daar v. Alvord* does not bar the courthouse door, must plaintiff thus be admitted and allowed to proceed? Plaintiff identifies a number of decisions, including three from different divisions of this district, which he claims authorize his taxpayer challenge under section 526a to Proposition Q. We have examined those decisions and understand their allure for plaintiff, for several of them do indeed state, or strongly imply, that section 526a *can* be employed to test the validity of a taxing statute. A close analysis of these decisions demonstrates that they are not direct or controlling authority on the point before us.

*Van Atta v. Scott* (1980) 27 Cal.3d 424 [166 Cal.Rptr. 149, 613 P.2d 210] involved a taxpayer action filed pursuant to section 526a challenging a county's application of state statutes providing for pretrial release of persons facing criminal charges. Although there is much space devoted in the opinion to the scope and operation of section 526a (*Van Atta v. Scott, supra*, at pp. 447–450), there was no issue of the validity of tax collection.

*Lundberg v. County of Alameda, supra*, 46 Cal.2d 644 involved a taxpayer suit aimed at a county exempting certain property from taxation. Thus, although it did involve a taxation measure, the point of the litigation was not to challenge the validity of that measure, or try to halt collection of taxes, but was meant to increase the amount of taxes collected by compelling county authorities to cease granting exemptions. That is precisely the opposite of what plaintiff is seeking.

*Pacific Motor Transport Co. v. State Bd. of Equalization* (1972) 28 Cal.App.3d 230 [104 Cal.Rptr. 558] (*Pacific Motor Transport Co.*) involved a declaratory relief action by trucking firms challenging the validity of an administrative rule and its application to them. Although the details are sparse, it appears that the two firms believed that "conducting intracity and intercity operations 'as separate enterprises' might lessen the overall tax burden." (*Id.* at p. 240.) Taking note of Revenue and Taxation Code former section 10276, the language of which paralleled the terms of article XIII, section 32, Division One of this district allowed the challenge to the validity of the regulation to proceed under Government Code former section 11440 (now § 11350).[6] However, the court's reasoning had several cautionary provisos:

---

[6] Part of the Administrative Procedure Act, Government Code section 11350 as relevant here provides: "Any interested person may obtain a judicial declaration as to the validity of any regulation . . . by bringing an action for declaratory relief in the superior court in accordance with the Code of Civil Procedure. The right to judicial determination shall not be affected by

"We note that Government Code section 11440, by its express terms, does no more than permit judicial determination *as to the validity* of a regulation. The policy behind Revenue and Taxation Code section 10276 proscribes *judicial interference* in the tax collection process. No sound reason appears why an interested party should not have the question of a tax regulation's validity determined, so long as the tax collector is not hindered in his duties thereby. State and federal courts are frequently, in one way or another, passing upon the validity of tax regulations after payment of the required tax. These determinations then affect taxpayers and tax collections in other pending and future cases. Rather than an impediment, such decisions must be considered as in aid of tax collection, for they tend to add certainty and conclusive legality to the process. They do no harm to the public policy expressed by section 10276.

"Care must be taken in judicial proceedings under Government Code section 11440 as they relate to such tax regulations, that the relief be limited in the statute's language to 'a judicial declaration as to the *validity* of' the questioned regulation. . . . The relief afforded may not 'prevent or enjoin' or otherwise hamper present or future tax assessment or collection effort against the plaintiff or anyone, as proscribed by section 10276. It will be presumed that the governmental agency will respect a judicial declaration concerning a regulation's validity. If it does not the taxpayer's remedy lies in paying the assessed taxes and then commencing action based upon such invalidity for their refund." (*Pacific Motor Transport Co., supra*, 28 Cal.App.3d 230, 236.)

. *Pacific Motor Transport Co.* is distinguishable on a number of points. Unlike the action here, it was an action against a state taxing agency. Unlike here, it involved a challenge to an administrative regulation. Unlike here, it was not a taxpayer action brought under section 526a, but a statutorily authorized challenge brought by parties who were actually subject to the tax. Further, it relied on an immunity statute that has subsequently been repealed.

the failure either to petition or to seek reconsideration of a petition filed pursuant to Section 11340.7 before the agency promulgating the regulation . . . . The regulation . . . may be declared to be invalid for a substantial failure to comply with this chapter, or, in the case of an emergency regulation or order of repeal, upon the ground that the facts recited in the finding of emergency prepared pursuant to subdivision (b) of Section 11346.1 do not constitute an emergency within the provisions of Section 11346.1." (Gov. Code, § 11350, subd. (a).)

This court has explained that "a party may be an 'interested' person for purposes of Government Code section 11350 if . . . it . . . is or may well be impacted by a challenged regulation." (*Environmental Protection Information Center v. Department of Forestry & Fire Protection* (1996) 43 Cal.App.4th 1011, 1017–1018 [50 Cal.Rptr.2d 892].) The most obvious impacts are "possible criminal prosecution or [professional] disciplinary action" by a licensing board (*Chas. L. Harney, Inc. v Contractors' Bd.* (1952) 39 Cal.2d 561, 564 [247 P.2d 913]; see *Sperry & Hutchinson Co. v. Cal. State Bd. of Pharmacy* (1966) 241 Cal.App.2d 229 [50 Cal.Rptr. 489]), or loss of statutory benefits (*Pacific Legal Foundation v. Unemployment Ins. Appeals Bd.* (1977) 74 Cal.App.3d 150, 154–155 [141 Cal.Rptr. 474]).

(See Stats. 1972, ch. 563, § 1, p. 965, repealing Rev. & Tax. Code, former § 10276.) Perhaps most significantly, the court did not confront—as we do here—an unabashed attempt to halt local efforts to collect a local tax. And, on this last point, Division One's opinion cannot be read to furnish any comfort to plaintiff, because the court's reluctance to do so is palpable.[7] Finally, 20 years later our Supreme Court has subsequently cited *Pacific Motor Transport Co.* for the proposition that "Government Code section 11350, which authorizes an action for declaratory relief to determine the validity of a regulation . . . is strictly construed in tax cases and may not be used to prevent the state from collecting taxes or, by parity of reasoning, to compel the state to refund taxes." (*Woosley v. State of California* (1992) 3 Cal.4th 758, 785, fn. 20 [13 Cal.Rptr.2d 30, 838 P.2d 758].)

*TRIM, Inc. v. County of Monterey* (1978) 86 Cal.App.3d 539 [150 Cal.Rptr. 351] (*TRIM*) involved a suit by a taxpayers' organization alleging that "some real property in Monterey County was properly assessed for property tax purposes at 100 percent of its fair market value, while other [real] property in the county was assessed at substantially less than the fair market value." (*Id.* at pp. 541–542.) Division Three of this district stated that "section 526a has . . . been construed to authorize a taxpayer to contest the legality of a taxing statute." (*Id.* at p. 542.) Again, the gist of the challenge was that "the county is wasting money because it is not collecting all that it could in revenues." (*Id.* at p. 543.) And even so, Division Three held that "these allegations are insufficient to state a cause of action for relief under Code of Civil Procedure section 526a." (*Ibid.*) There was no challenge to the validity of a tax, only the claim that unequal application was depriving the county of money to which it was entitled.

---

[7] "Section 10276 expresses a basic policy of tax law—that assessment and collection of taxes by governmental agencies charged with that duty shall not be judicially prevented, hampered, or enjoined. In an early case, *Dows* v. *City of Chicago* [(1870)] 78 U.S. 108, 110 [20 L.Ed. 65], the United States Supreme Court stated: 'Any delay in the proceedings of the officers, upon whom the duty is devolved of collecting the taxes, may derange the operations of government, and thereby cause serious detriment to the public. [¶] No court of equity will, therefore, allow its injunction to issue to restrain their action, except where it may be necessary to protect the rights of the citizen whose property is taxed, and he has no adequate remedy by the ordinary processes of the law . . . .'

"In *Modern Barber Col.* v. *Cal. Emp. Stab. Com.* [(1948)] 31 Cal.2d 720, 725–726 [192 P.2d 916], California's Supreme Court elaborated on this policy. It was said: 'The due process clause does not guarantee the right to judicial review of tax liability before payment. . . . "The prompt payment of taxes is always important to the public welfare. It may be vital to the existence of a government. The idea that every tax-payer is entitled to the delays of litigation is unreason[able]. . . ." ' (See also *Aronoff* v. *Franchise Tax Board* [(1963)] 60 Cal.2d 177, 179 [32 Cal.Rptr. 1, 383 P.2d 409].) The taxpayers' remedy, at least ordinarily, is to pay the assessed tax and then commence an action for its refund. As stated in *Modern Barber College*, at page 726, and *Aronoff*, at page 179, 'The power of a state to provide the remedy of suit to recover alleged overpayments as the exclusive means of judicial review of tax proceedings has long been unquestioned.' " (*Pacific Motor Transport Co., supra*, 28 Cal.App.3d 230, 234–235.)

The next authority invoked by plaintiff is the opinion of Division Four in *County of Sonoma v. State Bd. of Equalization* (1987) 195 Cal.App.3d 982 [241 Cal.Rptr. 215] (*County of Sonoma*). This was a suit by a county and one if its residents challenging the State Board of Equalization's interpretation of a state statute concerning exemption of geothermal steam from county taxation. The relief sought—and granted by the trial court—was a judicial declaration that Revenue and Taxation Code section 6353 did not exempt steam from local sales tax, and a writ of mandate directing the State Board of Equalization to commence collecting sales tax on behalf of Sonoma County, and then to remit those taxes to the county. (195 Cal.App.3d at pp. 985–987.)

Division Four held that the county and the individual had standing to sue to compel the board to alter its interpretation of the state law as exempting geothermal steam from county taxation: "Taxpayer suits are well recognized in California jurisprudence and are explicitly authorized by statute. (Code Civ. Proc., § 526a.) Among other things, section 526a has been interpreted as authorizing a taxpayer to contest the legality of a taxing statute. [(Citing *Lundberg v. County of Alameda* and *TRIM*.)]" (*County of Sonoma, supra*, 195 Cal.App.3d 982, 989.) The court further noted that judicial scrutiny of the board's interpretation argument "need not disrupt the orderly administration of the tax laws." (*Id.* at p. 990.) However, Division Four ultimately held that the individual and the county were entitled to no relief by virtue of an intervening amendment to the state statute expressly exempting sales of geothermal steam from county taxation, together with a legislative declaration that the amendment "was intended to be declaratory of existing law and to 'codify the longstanding administrative practice of the State Board of Equalization which interprets Section 6353 . . . as exempting steam from sales and use taxation.' (Stats. 1986, ch. 420, § 2.)" (*County of Sonoma, supra*, at pp. 988, 990–995.)

As evident from its citation of *Lundberg v. County of Alameda* and *TRIM*, what was at issue in *County of Sonoma* was an exemption from taxation, and thus a failure to collect revenues, not an actual expenditure that could be characterized as waste. Like *Pacific Motor Transport Co.*, it was an action against a state taxing agency. And there was no issue of judicial process hampering collection of sales tax. (See *Humane Society of the United States v. State Bd. of Equalization* (2007) 152 Cal.App.4th 349, 361, fn. 7 [61 Cal.Rptr.3d 277].)

The final authority cited by plaintiff[8] is *San Miguel Consolidated Fire Protection Dist. v. Davis* (1994) 25 Cal.App.4th 134 [30 Cal.Rptr.2d 343]

---

[8] In truth, plaintiff also adverts to *Andal v. City of Stockton* (2006) 137 Cal.App.4th 86 [40 Cal.Rptr.3d 34] (*Andal*), which involved a challenge to a fee apparently imposed to fund a municipal 911 "communication system" commenced by individuals and cell phone companies. (*Andal, supra*, at p. 89.) The *Andal* plaintiffs, like plaintiff here, alleged that the fee was not

(*San Miguel*). There, a number of special districts and individuals sued the State Controller and other state and local officials alleging that Revenue and Taxation Code former section 97.03, subdivision (c), which allocated a percentage of real property tax revenues from special districts to each county's educational revenue augmentation fund, was unconstitutional on a number of grounds. The plaintiffs also challenged the defendants' computations to determine the amounts allocated from the fund to local education authorities. The trial court denied the plaintiffs' petition for a writ of mandate and declaratory relief. The Court of Appeal for the Third Appellate District affirmed, and held that all of the plaintiffs' arguments against the statute were without merit. Before doing so, however, the court addressed the issue of the plaintiffs' standing. The court concluded that the special districts did not have standing but that the individuals did. To support this conclusion, the court simply quoted the passage from *County of Sonoma* that " 'section 526a has been interpreted as authorizing a taxpayer to contest the legality of a taxing statute.' " (*San Miguel, supra*, at p. 145, quoting *County of Sonoma, supra*, 195 Cal.App.3d 982, 989.)

The statute at issue in *San Miguel* was not a true taxing statute, in the sense that it did not itself generate revenue, but is more properly characterized as a statute allocating revenue already generated by other statutes. (See the text of Rev. & Tax. Code, former § 97.03, subd. (c), quoted in *San Miguel, supra*, 25 Cal.App.4th 134, 141–142, fn. 5.) Even if the *San Miguel* plaintiffs had succeeded in having the statute overturned, the net effect would not have reduced homeowner's property tax bill, or diminished the revenues available to any governmental unit. This would explain the absence of any effort to halt collection under the statute. The difficulties with the conclusion carried forward from *County of Sonoma* have already been addressed.

This review establishes that none of the authorities cited by plaintiff stands foursquare for the proposition that section 526a may be employed to challenge the validity of an actual taxing statute, much less that such a challenge can secure declaratory and injunctive relief prohibiting collection of that tax.

valid because it had not been submitted for voter approval as required by Proposition 218. That is the only point of similarity. *Andal* was not a taxpayer suit brought pursuant to section 526a. In addition, all of the plaintiffs in *Andal* actually paid the tax. (*Andal, supra*, at p. 89.) The Court of Appeal for the Third Appellate District held that the plaintiffs could proceed, even though they were not seeking refunds of the amounts they had paid and therefore had not exhausted the administrative refund process. (*Id.* at pp. 90–94.) Concerning *Andal*, the sole statement about it in plaintiff's opening brief is "A plaintiff need not follow the post-payment remedy method and exhaust administrative remedies if there is no adequate remedy provided for the issues raised and the relief sought. *Andal v. City of Stockton*[, *supra*,] 137 Cal.App.4th 86, 91–93."

Plaintiff's reliance on *City of Anaheim v. Superior Court* (2009) 179 Cal.App.4th 825 [102 Cal.Rptr.3d 171] is equally unavailing, because there the municipal tax was being challenged by parties actually being assessed the tax.

Our own research has failed to discover such a precedent. Upon deep reflection of the problem, we believe the explanations for this absence are obvious.

### Why We Agree with the Trial Court That Plaintiff Lacks Standing to Prosecute This Action

■ It is a truism in criminal law that capital prosecutions receive special attention because "death is different." (*Gregg v. Georgia* (1976) 428 U.S. 153, 188 [49 L.Ed.2d 859, 96 S.Ct. 2909].) So are taxes. They are the grease that makes the wheels of government go round. This inescapable reality was recognized long before section 526a was enacted in 1909. (Stats. 1909, ch. 348, § 1, p. 578.) In 1870, having served as Chief Justice of the California Supreme Court, Stephen Field penned these oft-quoted words for the United States Supreme Court: "It is upon taxation that the several States chiefly rely to obtain the means to carry on their respective governments, and it is of the utmost importance to all of them that the modes adopted to enforce the taxes levied should be interfered with as little as possible. Any delay in the proceedings of the officers, upon whom the duty is devolved of collecting the taxes, may derange the operations of government, and thereby cause serious detriment to the public." (*Dows v. City of Chicago, supra*, 78 U.S. 108, 110 (*Dows*).)

These are not mere dusty words from a bygone age. Their pertinency has, if anything, increased as "the operations of government" have expanded exponentially to meet the demands of modern life. Justice Field's words continue to be quoted by California courts—and the United States Supreme Court—to this day. (E.g., *State Bd. of Equalization v. Superior Court* (1985) 39 Cal.3d 633, 638–639 [217 Cal.Rptr. 238, 703 P.2d 1131]; *Pacific Gas & Electric Co. v. State Bd. of Equalization* (1980) 27 Cal.3d 277, 283 [165 Cal.Rptr. 122, 611 P.2d 463]; *Modern Barber Col. v. Cal. Emp. Stab. Com., supra*, 31 Cal.2d 720, 731–732; *Flying Dutchman, supra*, 93 Cal.App.4th 1129, 1136; *Levin v. Commerce Energy, Inc.* (2010) 560 U.S. ___, ___ [176 L.Ed.2d 1131, 130 S.Ct. 2323, 2330]; *California v. Grace Brethren Church* (1982) 457 U.S. 393, 410–411, fn. 23 [73 L.Ed.2d 93, 102 S.Ct. 2498].)

■ Not surprisingly, the law of tax remedies began with actual taxpayers trying to get refunds. Given the importance of a steady and predictable stream of income to states and local government, courts declined to act until the challenged tax had actually been paid. (E.g., *Springer v. United States* (1880) 102 U.S. 586, 594 [26 L.Ed. 253]; *State Bd. of Equalization v. Superior Court, supra*, 39 Cal.3d 633, 638–639 and decisions cited.) This was the genesis of the "Pay First Litigate Later" principle found in article XIII, section 32. Again, going back to Justice Field, a tax would be enjoined only in very rare

instances where more than a naked claim of illegality was raised: " 'A suit in equity will not lie to restrain the collection of a tax on the sole ground that the tax is illegal. There must exist in addition, special circumstances bringing the case under some recognized head of equity jurisdiction, such as that enforcement of the tax would lead to a multiplicity of suits or produce irreparable injury, or where the property is real estate, throw a cloud upon the title of the complainant.' "[9] (*Hannewinkle v. Georgetown* (1872) 82 U.S. 547, 549 [21 L.Ed. 231] [quoting *Dows*]; accord, e.g., *State Railroad Tax Cases* (1875) 92 U.S. 575, 613–614 [23 L.Ed. 663]; *Cheatham et al. v. United States* (1875) 92 U.S. 85, 89 [23 L.Ed. 561].) This reasoning was also adopted by the California Supreme Court, and by this court. (*Crocker v. Scott* (1906) 149 Cal. 575, 595 [87 P. 102]; *Sav. and Loan Society v. Austin* (1873) 46 Cal. 415, 488–489; *Helms Bakeries v. St. Bd. Equalization, supra,* 53 Cal.App.2d 417, 421.) But if there was an adequate remedy at law—which almost always meant a refund procedure—the collection of a tax would not be halted by the courts. (E.g., *Matthews v. Rodgers* (1932) 284 U.S. 521, 525–526 [76 L.Ed. 447, 52 S.Ct. 217]; *Boise Artesian Water Co. v. Boise City* (1909) 213 U.S. 276, 281 [53 L.Ed. 796, 29 S.Ct. 426]; *Eisley v. Mohan* (1948) 31 Cal.2d 637, 640–641 [192 P.2d 5]; Annot., Construction and application of statutes denying remedy by injunction against assessment or collection of tax (1937) 108 A.L.R. 184; 28 U.S.C. § 1341 [federal district courts "shall not enjoin, suspend or restrain the . . . collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State"].[10])

---

[9] In *Batt,* we noted that "preemptive, precollection, or prepayment lawsuits" had been permitted in "situations where the taxpayer is facing criminal penalties or is forced to endure unwarranted criminal procedures." (*Batt, supra,* 155 Cal.App.4th 65, 71–72 & fn. 4.) An additional instance is where a taxpayer is threatened with seizure of property without due process. (See *Dupuy v. Superior Court* (1975) 15 Cal.3d 410 [124 Cal.Rptr. 900, 541 P.2d 540].)

[10] Concerning this statute's language, the United States Supreme Court noted that it "could scarcely be more explicit—'no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court . . . .' The Court has interpreted the principal purpose of this language to be the protection of the Government's need to assess and collect taxes as expeditiously as possible with a minimum of pre-enforcement judicial interference, 'and to require that the legal right to the disputed sums be determined in a suit for refund.' [Citations.] The Court has also identified 'a collateral objective of the Act—protection of the collector from litigation pending a suit for refund.' [Citation.]" (*Bob Jones University v. Simon* (1974) 416 U.S. 725, 736–737 [40 L.Ed.2d 496, 94 S.Ct. 2038].) In this context, the statutory language "state law" has been construed to cover local taxes. (*Hibbs v. Winn* (2004) 542 U.S. 88, 100, fn. 1 [159 L.Ed.2d 172, 124 S.Ct. 2276].)

The federal statute protecting federal taxes—which dates back to 1867—is even more categorical, directing that "no suit for the purpose of restraining the assessment or collection of any [federal] tax shall be maintained in any court by any person, whether or not such person is the person against whom such tax was assessed." (Act of Mar. 2, 1867, ch. 169, § 10, 14 Stat. 475, now codified at 26 U.S.C. § 7421(a).)

Although they follow a different path, the example of the federal courts is not without relevance. Not having an equivalent of section 526a, and compelled to respect the constitutional requirement that they decide only actual "cases and controversies," allowing only a limited exception for challenges that can be framed under the free exercise or establishment clauses of the First Amendment, they otherwise do not entertain taxpayer challenges to state or federal taxing policies. (E.g., *Hein v. Freedom From Religion Foundation, Inc.* (2007) 551 U.S. 587, 599–602 [168 L.Ed.2d 424, 127 S.Ct. 2553]; *DaimlerChrysler Corp. v. Cuno* (2006) 547 U.S. 332, 343–346 [164 L.Ed.2d 589, 126 S.Ct. 1854]; *ASARCO Inc. v. Kadish* (1989) 490 U.S. 605, 613–614 [104 L.Ed.2d 696, 109 S.Ct. 2037]; *Valley Forge College v. Americans United* (1982) 454 U.S. 464, 475–479 [70 L.Ed.2d 700, 102 S.Ct. 752]; *Doremus v. Board of Education* (1952) 342 U.S. 429, 433–434 [96 L.Ed. 475, 72 S.Ct. 394]; *Alabama Power Co. v. Ickes* (1938) 302 U.S. 464, 478 [82 L.Ed. 374, 58 S.Ct. 300].) Congress has even enacted a statute very much to the same effect as our article XIII, section 32. (28 U.S.C. § 1341, quoted *ante.*)

The rationale for this federal abstention is that a taxpayer lacks standing because the financial interest "shared with millions of others, is comparatively minute and indeterminable . . . remote, fluctuating and uncertain." (*Frothingham v. Mellon* (1923) 262 U.S. 447, 487 [67 L.Ed. 1078, 43 S.Ct. 597] (*Frothingham*) (decided with *Massachusetts v. Mellon*).) "The administration of any statute, likely to produce additional taxation to be imposed upon a vast number of taxpayers, the extent of whose several liability is indefinite and constantly changing, is essentially a matter of public and not of individual concern. If one taxpayer may champion and litigate such a cause, then every other taxpayer may do the same, not only in respect of the statute here under review but also in respect of every other appropriation act and statute whose administration requires the outlay of public money, and whose validity may be questioned. The bare suggestion of such a result, with its attendant inconveniences, goes far to sustain the conclusion which we have reached, that a suit of this character cannot be maintained." (*Frothingham, supra,* at p. 487.) "The party who invokes the [judicial] power must be able to show not only that the statute is invalid but that he has sustained or is immediately in danger of sustaining some direct injury as the result of its enforcement, and not merely that he suffers in some indefinite way in common with people generally." (*Id.* at p. 488; cf. *Fairchild v. Hughes* (1922) 258 U.S. 126, 129 [66 L.Ed. 499, 42 S.Ct. 274] (maj. opn. of Brandeis, J.) ["Plaintiff has only the right, possessed by every citizen, to require that the Government be administered according to law and that the public moneys be not wasted."].) The court deemed it "of much significance that no precedent sustaining the right to maintain suits like this has been called to our attention." (*Frothingham, supra,* at p. 487.)

One of the benchmark federal decisions on standing, and the one which established the limited exception to the general rule against taxpayer standing, is *Flast v. Cohen, supra*, 392 U.S. 83. As previously mentioned, the court in *Flast* stated "The fundamental aspect of standing is that it focuses on the party seeking to get his complaint before a . . . court and not on the issues he wishes to have adjudicated." (*Id.* at p. 99.) However, the court seemingly undercut this formulation by also stating that "in ruling on [taxpayer] standing, it is both appropriate and necessary to look to the substantive issues . . . to determine whether there is a logical nexus between the status asserted and the claim sought to be adjudicated" in order to ascertain whether the plaintiff "is a proper and appropriate party to invoke [the] judicial power." (*Id.* at p. 102.) This is to say that the plaintiff must prove a direct injury that goes beyond "a generalized grievance" and " 'general interest common to all members of the public' " (*United States v. Richardson* (1974) 418 U.S. 166, 174–176 & 178 [41 L.Ed.2d 678, 94 S.Ct. 2940], quoting *Ex parte Lévitt* (1937) 302 U.S. 633, 634 [82 L.Ed. 493, 58 S.Ct. 1]), or one "shared in substantially equal measure by all or a large class of citizens." (*Warth v. Seldin* (1975) 422 U.S. 490, 499 [45 L.Ed.2d 343, 95 S.Ct. 2197].) "Thus, when the plaintiff is not himself the object of the governmental action or inaction he challenges, standing is not precluded, but it is ordinarily 'substantially more difficult' to establish." (*Lujan v. Defenders of Wildlife* (1992) 504 U.S. 555, 562 [119 L.Ed.2d 351, 112 S.Ct. 2130].)

These considerations have not found expression in California decisions considering section 526a. Nevertheless, an analysis of the substantive issues (see *Flast v. Cohen, supra*, 392 U.S. 83, 102) persuades us that the underlying reasoning is equally transferrable to the context of taxpayer actions brought under that statute to challenge the validity of local taxing statutes.

The principle that courts should refrain from enjoining collections exacted by a taxing statute first appeared in the California Constitution in 1910. (See *Eisley v. Mohan, supra*, 31 Cal.2d 637, 640.) But it had already been receiving judicial recognition for almost a century. (See *Dows, supra*, 78 U.S. 108, 111, citing *Heywood v. City of Buffalo* (1856) 14 N.Y. 534; *Hannewinkle v. Georgetown, supra*, 82 U.S. 547, 548, citing *Heywood* and *Mooers v. Smedley* (N.Y. 1822) 6 Johnson's ch. 27.[11]) Article XIII, section 32 embodies this principle, but its vitality is not dependent on its expression in article XIII, section 32. As previously shown, the California Supreme Court was enforcing the principle long before enactment of section 526a in 1909 and the adoption of the predecessor version of former article XIII, section 32 the following year. (See *Crocker v. Scott, supra*, 149 Cal. 575, 595; *Sav. and Loan Society v. Austin, supra*, 46 Cal. 415, 488–489; see also *Pacific Gas &*

---

[11] It should not be overlooked that all of these decisions involved *municipal* tax statutes.

*Electric Co. v. State Bd. of Equalization, supra,* 27 Cal.3d 277, 280–281, fns. 3, 5 [history of art. XIII, § 32].)

The concerns behind article XIII, section 32, *Dows,* and the federal decisions about taxpayer standing are clearly germane even if they have not been codified. " 'The fear that persistent interference with the collection of public revenues, for whatever reason, will destroy the effectiveness of government has been expressed in many judicial opinions' " *(State Bd. of Equalization v. Superior Court, supra,* 39 Cal.3d 633, 638–639, quoting *Modern Barber Col. v. Cal. Emp. Stab. Com., supra,* 31 Cal.2d 720, 731) and has not lost any force. If anything, in these post-Proposition 13 times of restricting the ability of local government to develop new sources of revenue, interference could have even more drastic consequences.

The academic examinations of section 526a do not show that taxpayer actions have been allowed to challenge the validity of a tax or halt collections of revenue. And one of the studies, echoing *Frothingham,* in fact acknowledges the possibility that taxpayer actions could be used for improper reasons such as "challeng[ing] political decisions" or "constant harassment of officials" leading to "vexatious litigation" that "may plague the courts when state taxpayers' suits are brought before them." (Note, *California Taxpayers' Suits: Suing State Officers Under Section 526a of the Code of Civil Procedure* (1976) 28 Hastings L.J. 477, 496–497; see Collins & Myers, *The Public Interest Litigant in California: Observations on Taxpayers' Actions* (1977) 10 Loy. L.Rev. 329; *Frothingham, supra,* 262 U.S. 447, 487; cf. Com., *Taxpayers' Suits: A Survey and Summary* (1960) 69 Yale L.J. 895, 909–910 ["Taxpayers' suits' potential for harassment may encourage governmental immobility and inhibit progressive community action . . . and unduly burden city officials who must defend against such suits . . ."].) The examination of the California decisions undertaken above likewise shows the absence of a single reported instance where tax collection has been enjoined. Like the United States Supreme Court, we deem this precedential void of almost 140 years significant as circumstantial confirmation that such a power—subject to extraordinary exceptions as suggested in *Dows*—does not generally exist. (See *Frothingham, supra,* 262 U.S. 447, 488.)

It is one thing to provide an opportunity for a person or entity to challenge the legality of a tax already paid. Indeed, that opportunity is commanded by due process. (See *Batt, supra,* 155 Cal.App.4th 65, 71–73 and authorities cited.) However, that person or entity "may not go into court and obtain adjudication of the validity of a tax which is due but not yet paid." *(State Bd. of Equalization v. Superior Court, supra,* 39 Cal.3d 633, 638.) The City rightly insists that the "Pay First, Litigate Later" principle which is also embodied in article XIII, section 32, cannot be ignored. If plaintiff's construction of section 526a is accepted, the taxpayer not actually subject to a tax will

paradoxically be in a more advantageous position than will someone who must pay the tax. The latter party will be obliged to pay the tax, exhaust all administrative remedies, and only then be entitled to go to the courts. But while the actual taxpayer must satisfy all of these conditions precedent, a section 526a "taxpayer" can jump the queue ahead of those who actually paid the tax and race to court the day after a taxing statute is enacted.[12] This places the section 526a "taxpayer" in an invidious position. The person actually required to pay the tax must wait while someone far less aggrieved may already be racing to the courts. The section 526a "taxpayer" may be no less hostile to the taxing statute, but it is not possible to view that hostility as lacking the precise focus of the actual payer who wants his or her money back. The section 526a "taxpayer" challenging the taxing statute would, in the words of Justice Brandeis, be asserting "only the right, possessed by every citizen, to require that the Government be administered according to law and that the public moneys be not wasted." (*Fairchild v. Hughes, supra,* 258 U.S. 126, 129.) This is precisely the sort of "generalized grievance" seeking vindication of a " 'general interest common to all members of the public' " (*United States v. Richardson, supra,* 418 U.S. 166, 176), which in this situation would seem to mean any person or entity who pays any sort of a tax in San Francisco. Yet, given existing construction of section 526a, the potential plaintiffs would expand to include nonresident taxpayers. (See *Irwin v. City of Manhattan Beach, supra,* 65 Cal.2d 13, 18–20.) This would be precisely the situation of courts hearing challenges to taxing statutes mounted by plaintiffs armed with only "comparatively minute and indeterminable . . . remote, fluctuating and uncertain" interest that is "shared with millions of others." (*Frothingham, supra,* 262 U.S. 447, 487; see *Holmes v. California Nat. Guard, supra,* 90 Cal.App.4th 297, 315.)[13] The resulting uncertainty, if not chaos, for the thousands of local taxing authorities would obviously be dire.

It cannot be denied that there is considerable force in plaintiff's argument that "a claim for refund could never redress the harm that [the] Complaint and Section 526a seek to prevent—the wasteful expenditure of public monies

---

[12] Without contradiction from the City, plaintiff states in his opening brief that "Payroll Tax returns are not due until February 2010," which was approximately 16 months after Proposition Q was passed by the voters, and approximately 14 months after plaintiff filed his complaint. This only emphasizes the advantage a plaintiff using section 526a would enjoy over someone actually required to pay the tax.

[13] One of the authorities cited in *Holmes v. California Nat. Guard* is *Carsten v. Psychology Examining Com.* (1980) 27 Cal.3d 793 [166 Cal.Rptr. 844, 614 P.2d 276], where our Supreme Court discussed the concept of standing, and, citing several of the federal decisions quoted here—including *Frothingham* (under the name of the companion case, *Massachusetts v. Mellon*)—concluded that California law on this point "is consistent with federal law and a long line of decisions of the United States Supreme Court." (*Id.* at pp. 796–797.)

in implementing an invalid ordinance. Those expenditures are already underway and the public monies at issue will have already been squandered before any tax returns are due pursuant to Proposition Q." (See fn. 12, *ante.*) But this logic must yield to the reality that plaintiff sought to prevent this "waste" by halting the City's collection in its tracks with an injunction. However, as already shown, that is a remedy California's common law had virtually forbidden prior to enactment of section 526a. So, when plaintiff asserts that "Section 526a lacks any exception for tax-related cases," he fails to foresee that the statute would have to be construed to include such an exception because the Legislature would be presumed to have been aware of the common law aversion to enjoining tax collection. (See, e.g., *Estate of Banerjee* (1978) 21 Cal.3d 527, 537 [147 Cal.Rptr. 157, 580 P.2d 657]; *In re Marriage of Bouquet* (1976) 16 Cal.3d 583, 588 [128 Cal.Rptr. 427, 546 P.2d 1371]; *McFadden v. Jordan* (1948) 32 Cal.2d 330, 334 [196 P.2d 787].) By correctly noting that "the anti-injunction principle and section 526a must be reconciled," plaintiff anticipates our conclusion. And citing *Pacific Motor Transport Co., supra*, 28 Cal.App.3d 230, certainly does not aid plaintiff because the court there specifically noted the crucial proviso: "No sound reason appears why an interested party should not have the question of a tax regulation's validity determined, *so long as the tax collector is not hindered in his duties thereby.*" (*Id.* at p. 236, italics added.) The court deemed the point sufficiently important to warrant reiteration: "The relief afforded may not 'prevent or enjoin' or otherwise hamper *present or future tax assessment or collection effort against the plaintiff or anyone . . . .*" (*Ibid.*, italics added.) A third time, as previously noted, the *Pacific Motor Transport Co.* court also quoted *Dows* in noting that injunctive relief—the very remedy the plaintiff sought—was not available. (See fn. 7, *ante.*) Finally, plaintiff is alleging only the illegality of Proposition Q, without any of the special circumstances that permit equitable intervention in the form of an injunction. (*State Railroad Tax Cases, supra*, 92 U.S. 575, 613; *Hannewinkle v. Georgetown, supra*, 82 U.S. 547, 549; *Dows, supra*, 78 U.S. 108, 109; *Sav. and Loan Society v. Austin, supra*, 46 Cal. 415, 488; *Helms Bakeries v. St. Bd. Equalization, supra*, 53 Cal.App.2d 417, 421.)

■ In light of the foregoing, our independent review compels us to conclude that the trial court hit the nail on the head with its ruling that "Plaintiff lacks standing to sue. This Court may not grant injunctive relief to prevent tax collection." "A lack of standing is a jurisdictional defect to an action that mandates dismissal." (*Cummings v. Stanley* (2009) 177 Cal.App.4th 493, 501 [99 Cal.Rptr.3d 284].) Because the trial court correctly reached this

conclusion, and there being no suggestion that plaintiff could amend around it, the dismissal of plaintiff's complaint was proper.[14]

## DISPOSITION

The judgment of dismissal is affirmed. The parties shall bear their respective costs on appeal.[15]

Haerle, Acting P. J., and Lambden, J., concurred.

A petition for a rehearing was denied November 17, 2010, and on November 16, 2010, the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied January 26, 2011, S188544.

---

[14] In its brief, the City contends that plaintiff's emphasis upon the contents of the voter pamphlet for Proposition Q reflects that plaintiff is in effect attempting to invalidate the November 2008 election without complying with the stringent substantive and time limitations governing election contests. (See Elec. Code, §§ 16100, 16401; *Friends of Sierra Madre v. City of Sierra Madre* (2001) 25 Cal.4th 165, 192–194 [105 Cal.Rptr.2d 214, 19 P.3d 567].) We need not address this argument because it was not a ground for the City's demurrer and thus cannot serve as a basis for affirmance. (E.g., *Carman v. Alvord* (1982) 31 Cal.3d 318, 324 [182 Cal.Rptr. 506, 644 P.2d 192]; *Mendoza v. Town of Ross* (2005) 128 Cal.App.4th 625, 631 [27 Cal.Rptr.3d 452].)

[15] Although plaintiff has not prevailed, he has had the assistance of exceptionally competent counsel.